[No. B076865. Second Dist., Div. Seven. Mar. 20, 1996.]

DEBRA S. ROSENBAUM, Plaintiff and Appellant, v.
SECURITY PACIFIC CORPORATION et al., Defendants and Appellants.

**COUNSEL**

Browne Greene, Geoffrey Wells, Stuart B. Esner, Rosalyn S. Zakheim and Billie Ann U. Higa for Plaintiff and Appellant.

Roland A. Dwyer, Toni Rae Bruno and Robert W. Carney for Defendants and Appellants.

## Opinion

**WOODS (Fred), J.**—The issue in this case is whether a landlord can be held liable for a tenant's injuries caused by the criminal activities of third persons off the premises. For the reasons discussed below, we conclude that under the circumstances of this case the landlord had no duty to protect plaintiff from an attack on a public street and therefore affirm the judgment for defendant.[1]

### Facts and Proceedings Below

Plaintiff, Debra Rosenbaum, brought this negligence action against her landlord, Security Pacific Corporation, after she was robbed and severely injured on the street in front of her apartment building. We state the facts in the light most favorable to the verdict for plaintiff. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 278, p. 289.)

In 1985, plaintiff moved into the Plymouth Apartments located at the intersection of 8th Street and Plymouth Boulevard in Los Angeles. The premises consist of two apartment buildings, two garage buildings in the rear and a central courtyard between the buildings. A hallway provides access from the courtyard to the rear driveway and garages. Plaintiff lived in the front corner apartment facing Plymouth Boulevard. Her garage door faced 8th Street. The shortest route from her garage to her apartment was to walk up 8th Street to a driveway behind the apartment buildings, down the driveway to a hallway that led to the courtyard and through the courtyard to the front door of her apartment.

Plaintiff testified the 8th Street garage area was very dark at night. The only lighting was from two 100-watt floodlights which provided little illumination. There was no direct lighting in the hallway linking the courtyard to the driveway and garage area. In addition, the courtyard was always very dark. The only lighting was supplied by the porch lights of the individual

---

[1]This case is before us on plaintiff's appeal from the judgment entered after the granting of defendants' motion for judgment notwithstanding the verdict and from the alternative order granting defendants' motion for new trial. Because we affirm the judgment notwithstanding the verdict the order granting new trial is ineffective and the appeal from that order will be dismissed. (Code Civ. Proc., § 629.) Defendant filed a protective cross-appeal from the judgment on the verdict. It does not appear from the record any such judgment was ever entered but, in any event, the cross-appeal will be dismissed as moot.

apartment units. If the tenants did not manually turn on their porch lights, the courtyard was "pitch black." Even so, only four of the porch lights worked and the courtyard was very dark even if all four lights were on.

Plaintiff never used her garage because she did not believe it was safe to do so. The lack of lighting in the hallway and the courtyard also influenced her decision not to park in the garage. Instead she would park on Plymouth Boulevard as close to the apartment building and her front door as she could.

Prior to the attack on plaintiff which led to this lawsuit there had been numerous robberies and assaults on the tenants of the Plymouth Apartments in the garage area and the courtyard. One tenant's apartment had been burglarized twice. Plaintiff herself had been assaulted on the street two years earlier while getting out of her car. Defendant was aware of these crimes and the tenants' complaints about the inadequacy of lighting on the premises. Defendants promised to add additional lighting but never did so.

On an evening in December 1989, plaintiff returned home from school and parked her car on Plymouth Boulevard across the street from her apartment, near, but not directly under, a street light. As plaintiff was removing some of her things from her car she saw a car come down 8th Street and turn onto Plymouth. The car stopped alongside hers. One of the men in the car grabbed plaintiff and forced her into the backseat where there were two other men. Plaintiff was robbed and shot in the head, then released. She suffered devastating injuries, including permanent brain damage.

The evidence showed the attack on plaintiff was part of a crime spree in which the same men who assaulted her had committed another robbery earlier that night on a street nearby and, immediately after robbing and shooting plaintiff, proceeded to rob a man and his wife on another street in the same vicinity.

Plaintiff's expert testified the insufficient lighting at the Plymouth Apartments posed a dangerous condition because it created an opportunity for an attacker to conceal himself in the darkness of the garage area, hallway and courtyard. This dangerous condition, the expert testified, could have been eliminated easily and inexpensively by the installation of high-density mercury vapor lights in the courtyard, hallway and garage area.

The jury returned a special verdict finding defendants were negligent and that their negligence was a legal cause of plaintiff's injury. It further found plaintiff suffered economic and noneconomic damages totaling approximately $3.5 million. The jury then apportioned fault, finding the assailants to

be responsible for 90 percent of plaintiff's injuries, defendants responsible for 9 percent and plaintiff responsible for 1 percent.

Defendants moved for judgment notwithstanding the verdict and, alternatively, for a new trial. The trial court granted both motions.

In explaining its reasons for granting the motion for judgment notwithstanding the verdict the court accepted as a fact plaintiff at all times would have parked in the 8th Street garage but for the poor lighting in the garage areas, the inner pathway and the courtyard. The court further stated that for purposes of the motion it accepted "the lighting at the garage, at the courtyard area and on the pathways in between [was] poor at best for purpose of security in deterring . . . would-be attackers" and "Security Pacific Bank knew and reasonably should have known about the poor lighting, the previous criminal attacks and the possible added safety of good lighting." As to the facts of the assault on plaintiff, the court found the attackers were in a car which turned from 8th Street onto Plymouth Boulevard; plaintiff was attacked as she was exiting her car on the street approximately 30 feet from a lit street light; and, plaintiff was the second victim in a series of 3 attacks the same night by the same individuals all within the same vicinity and all following essentially the same pattern.

From these facts the trial court concluded plaintiff would have been just as vulnerable to attack if she had parked in her garage. The court pointed out, "there is no evidence that lighting or the lack thereof on or about the property or anywhere else was a factor encouraging or discouraging the attackers in this case." Therefore, the court concluded, "I was remiss in instructing the jury the way I did as to the duty and that there appears to have been no duty for the defendant to provide security against an off-premises . . . criminal attack as occurred in this case.[2] Further, there appears to me to be no causal nexus between any failure to light the premises and Ms. Rosenbaum's injury."

Plaintiff filed a timely appeal from the judgment notwithstanding verdict and from the alternative order granting a new trial.

### I. Standard of Review Applicable to Judgment Not Withstanding the Verdict

In reviewing a judgment notwithstanding the verdict we accept as true the evidence in support of the verdict and view all the evidence in the

---

[2]The trial court gave the jury the standard BAJI instructions on the general duty of an owner, occupant or lessor of premises (BAJI No. 8.00) and the specific duty of a landlord to protect others from criminal acts of third parties (BAJI No. 8.22).

light most favorable to the verdict. (*Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530, 546 [138 Cal.Rptr. 705, 564 P.2d 857, 99 A.L.R.3d 158].)[3] The question of whether a duty exists is a question of law which we review de novo on appeal. (*Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 674 [25 Cal.Rptr. 137, 863 P.2d 207].)

II. *Under the Circumstances of This Case, the Landlord Owed the Tenant No Duty to Protect Her From Criminal Activity Off the Premises.*

A landlord's duty to protect tenants from injuries caused by the criminal acts of third parties is a recent development.[4] The leading case is *Kline* v. *1500 Massachusetts Avenue Apartment Corp.* (1970) 439 F.2d 477 [141 App.D.C. 370, 43 A.L.R.3d 311].

The plaintiff in *Kline* sued her landlord to recover for injuries she suffered when she was assaulted and robbed in the hallway outside her apartment. The facts showed security at the apartment building had declined over the years while the crime rate in the neighborhood had risen. Furthermore, an increasing number of assaults and robberies were being perpetrated against the tenants from within the common hallways including one just two months before the attack on Ms. Kline. The landlord was aware of all these facts but failed to take any steps to make the building more secure. The trial court granted judgment to the landlord on the ground a landlord owed no duty to protect its tenants from foreseeable criminal acts committed by third parties. (439 F.2d at p. 478.) The Court of Appeals acknowledged this was the generally accepted rule in many jurisdictions including the District of Columbia Circuit but concluded ". . . the rationale of this very broad general rule falters when it is applied to the conditions of modern day urban apartment living, particularly in the circumstances of this case." (*Id.* at p. 481.) Those circumstances included the facts the landlord ". . . has notice of repeated criminal assaults and robberies, has notice that these crimes occurred in the portion of the premises exclusively within his control, has every reason to expect like crimes to happen again, and has the exclusive power to take preventive action . . . ." (*Ibid.*) The court gave three specific reasons for departing from the traditional rule of nonliability.

"As between tenant and landlord, the landlord is the only one in the position to take the necessary acts of protection required. . . . In the area of the predictable risk which materialized in this case, only the landlord could

---

[3]Disapproved on another point by *Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548 [34 Cal.Rptr.2d 607, 882 P.2d 298].

[4]See Merrill, *Landlord Liability for Crimes Committed by Third Parties Against Tenants on the Premises* (1985) 38 Vand. L.Rev. 431, 436-438 (hereafter *Landlord Liability*).

have taken measures which might have prevented the injuries suffered by appellant. [¶] Secondly, . . . there is implied in the contract between landlord and tenant an obligation on the landlord to provide those protective measures which are within his reasonable capacity. . . . [¶] Thirdly, if we reach back to seek the precedents of common law, on the question of whether there exists or does not exist a duty on the owner of the premises to provide protection against criminal acts by third parties, the most analogous relationship to that of the modern day urban apartment . . . dweller is not that of a landlord and tenant, but that of innkeeper and guest." (439 F.2d at pp. 484-485.)[5]

█ Since the decision in *Kline,* a landlord's duty to take reasonable steps to secure common areas of the premises against foreseeable criminal acts of third parties has become well established law in California. (*Ann M.* v. *Pacific Plaza Shopping Center, supra,* 6 Cal.4th at p. 674; and see, e.g., *Kwaitkowski* v. *Superior Trading Co.* (1981) 123 Cal.App.3d 324, 328 [176 Cal.Rptr. 494] [tenant raped in dimly lit, unsecured lobby of apartment building].) Furthermore, a landlord's liability is not limited to injuries which result from criminal acts occurring in the common areas of the premises. In *O'Hara* v. *Western Seven Trees Corp.* (1977) 75 Cal.App.3d 798 [142 Cal.Rptr. 487] the court held a tenant raped inside her apartment stated a cause of action for negligence against her landlord based on the landlord's failure to provide adequate security in the common areas. Rejecting the landlord's argument it had no control over what took place inside the tenant's apartment, the court pointed out "[f]ailure to take reasonable precautions to safeguard the common areas under [the landlord's] control could have contributed substantially, as alleged, to [the tenant's] injuries." (*Id.* at p. 803.) In *Frances T.* v. *Village Green Owners Assn.* (1986) 42 Cal.3d 490, 501-503 [229 Cal.Rptr. 456, 723 P.2d 573, 59 A.L.R.4th 447], our Supreme Court applied the *O'Hara* reasoning to a case in which a condominium owner sued the owners association for negligence after she was raped in her dwelling. The plaintiff contended the owners association was negligent in failing to install sufficient exterior lighting and requiring her to remove additional lighting she had installed herself. In holding the complaint stated a cause of action for negligence the court reasoned: "The facts alleged here, if proven, demonstrate defendant's awareness of the need for additional lighting and of the fact that lighting could aid in deterring criminal conduct, especially break-ins." (*Id.* at p. 503.) Thus, the association owed a duty to the plaintiff on the theory that an exterior condition over which it had control contributed to the rape.

---

[5]The court found that under the law of innkeeper and guest a duty existed on the part of the innkeeper to protect its guests from abuse or molestation by third parties. (*Kline* v. *1500 Massachusetts Avenue Apartment Corp., supra,* 439 F.2d at p. 482.)

Given the precedents of *Frances T.* and *O'Hara, supra*, it is fair to say that under California law "the location of the crime does not necessarily determine the landowner's liability for injuries resulting from criminal acts." (*Ann M.* v. *Pacific Plaza Shopping Center, supra*, 6 Cal.4th at p. 675.) However, no case in California, nor any other jurisdiction so far as we can determine, has extended the landlord's liability for the criminal acts of third persons to injuries suffered by the tenant off the premises.

California cases which have considered a property owner's duty in the context of injuries occurring off the property have imposed liability only if the harm was foreseeable *and* the owner controlled the site of the injury (*Schwartz* v. *Helms Bakery Limited* (1967) 67 Cal.2d 232, 239 [60 Cal.Rptr. 510, 430 P.2d 68]), or affirmatively created a dangerous condition on the site (*Kopfinger* v. *Grand Central Pub. Market* (1964) 60 Cal.2d 852, 858 [37 Cal.Rptr. 65, 389 P.2d 529]) or if there was a functional connection between the owner's conduct and the injury suffered (*McDaniel* v. *Sunset Manor Co.* (1990) 220 Cal.App.3d 1, 9, 10 [269 Cal.Rptr. 196].) None of these factors are present in the case before us. Clearly, Security Pacific Corporation did not control the public street on which plaintiff's injury occurred, nor did it create the dangerous condition of a band of marauding thugs using the street to seek out victims to attack. Nor do we find a "[close] connection between the defendant's conduct" in failing to adequately light the common areas of the apartment building "and the injury suffered" by plaintiff when she was attacked on a public street. (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].)

As previous cases have made clear, the duty of a landlord to protect the tenant from criminal activity is not a general one but arises only where the landlord's negligence facilitates the criminal act. (See, e.g., *O'Hara* v. *Western Seven Trees Corp., supra*, 75 Cal.App.3d at p. 803; *Kline, supra*, 439 F.2d at p. 480.) The landlord is not the "insurer of his tenant's safety." (*Kline* v. *1500 Massachusetts Avenue Apartment Corp., supra*, 439 F.2d at p. 481.) Rather, the landlord's duty to provide adequate lighting in common areas arises because failure to do so may facilitate a criminal attack on the tenant in the common areas or the tenant's apartment. (*O'Hara, supra*, 75 Cal.App.3d at p. 803.)[6] In other words, a duty is imposed on the landlord where there is a close, or functional, connection between the landlord's

---

[6]Common experience and reason support the conclusion that crimes against the person are more likely to occur at night in places where darkness allows the perpetrator to operate unseen. (*Onciano* v. *Golden Palace Restaurant, Inc.* (1990) 219 Cal.App.3d 385, 393 [268 Cal.Rptr. 96]; *Slapin* v. *Los Angeles International Airport* (1976) 65 Cal.App.3d 484, 488 [135 Cal.Rptr. 296].) It is also generally accepted by California courts that adequate lighting deters criminal activity to some extent. (*Frances T.* v. *Village Green Owners Assn., supra*, 42 Cal.3d at p. 503.)

conduct and the harm suffered. (*Rowland* v. *Christian*, *supra*, 69 Cal.2d at p. 113; *McDaniel* v. *Sunset Manor Co.*, *supra*, 220 Cal.App.3d at pp. 9, 10.)

*McDaniel* v. *Sunset Manor Co.*, *supra*, 220 Cal.App.3d 1 illustrates the close or functional connection between conduct and injury necessary to impose liability on a landlord for injuries suffered by a tenant off the premises. In *McDaniel,* the two-year-old plaintiff, a Sunset Manor resident, suffered severe injuries when she wandered through a dilapidated fence behind her residence and fell into a creek on the adjoining property. The fence was on property owned and controlled by Sunset Manor but Sunset Manor had no ownership or control over the property containing the creek. In a suit against Sunset Manor for negligence in the maintenance of the fence the trial court granted summary judgment for the defendant on the ground "that since the peril arose from features of the land over which it had no control, it cannot be liable for plaintiff's injury." (*McDaniel, supra*, 220 Cal.App.3d at p. 7.) The Court of Appeal reversed, stating: "While it is true that our consideration of Sunset Manor's duty depends in part on the connection between the conduct and the injury [citation], we find that connection sufficiently close to satisfy a duty analysis as a matter of law . . . [¶] . . . [¶] . . . [T]he function of a fence, whether intended or illusory, is that of a barrier to prevent free crossing of a boundary line. The illusion created by the fence here was that it was designed to prevent access to the adjacent property and its creek—an illusion which may have heightened the danger. A landlord who makes repairs or improvements on property, which give a deceptive appearance of safety, is subject to liability for injury caused by the condition. [Citation.]" (*Id.* at pp. 9, 10.)

Thus, in *McDaniel,* the court found a close connection between the landlord's conduct in failing to repair the fence and the plaintiff's injury because the function of the fence was to protect against the very risk of a child wandering onto the adjacent property and falling into the creek. As we explain below, no such close or functional connection between the landlord's conduct and the tenant's injury exists in the present case.

■ Plaintiff attempts to establish liability in this case by arguing Security Pacific Corporation had a duty to secure its premises against criminal acts of third parties and her injury was a foreseeable result of its failure to do so. Her argument is as follows. Security Pacific Corporation had a duty of care to adequately light the entire premises, including the garage area, courtyard and walkways, given the numerous tenant complaints regarding the darkness of the premises and the repeated instances of criminal attacks on and near the premises. Security Pacific Corporation breached this duty of care by failing to adequately light the premises thereby causing plaintiff to

decide not to use her assigned garage out of fear for her safety and to park on the street instead. If plaintiff had been in her garage on the night in question she would not have been attacked. Therefore, it was the dangerous condition of the apartment premises which caused plaintiff to park on the street and thereby become vulnerable to the attack which was perpetrated on her.

Under this theory, a plaintiff establishes a landowner's liability by establishing the existence of a dangerous condition on the property and letting the doctrines of foreseeability and proximate cause do the rest. Such a theory was rejected in *Medina* v. *Hillshore Partners* (1995) 40 Cal.App.4th 477 [46 Cal.Rptr.2d 871]. In *Medina,* gang members mistook Mr. Medina for a member of a rival gang. They attacked and killed him as he was walking near an apartment complex owned by defendants. The plaintiffs alleged defendants were liable for Mr. Medina's death because they allowed the gang, which included tenants and nontenants, to congregate in and around the apartment complex thereby creating a dangerous condition on the premises. The Court of Appeal affirmed dismissal of the action on the ground that under the facts pled in the complaint the defendant landowners owed no duty "to protect members of the public from gang members who congregate around an apartment complex and assault individuals on adjacent public streets." (*Id.* at p. 481.) The court reasoned: "The negligence and premises liability causes of action fail because no facts are alleged that the decedent entered the apartment complex or was assaulted on property controlled by landowner. No court has extended [liability] to a situation where a tenant leaves the premises and shoots a pedestrian on an adjacent street." (*Id.* at pp. 483-484.) Thus, even assuming that allowing the gang to congregate on the premises constituted a dangerous condition, there was an insufficient causal nexus between this condition and the independent, intentional killing of Mr. Medina off the premises.

The theory of liability in the present case is even more attenuated than the one rejected in *Medina* because here it cannot be argued the dangerous condition the defendants created on the premises spilled over into the public streets causing plaintiff's injury. Unlike the apartment building in *Medina,* which provided a meeting point for the gang and a launching pad for its attack on the victim, the inadequate lighting on the premises of the Plymouth Apartments played no role in facilitating the attack on Ms. Rosenbaum. This case has nothing to do with the landlord's creation of an opportunity to commit crime by providing the perpetrator a place of concealment. Plaintiff's assailants were not lurking in the shadows of her garage or the passageway to her apartment nor did they originate their street attack from a dark area of the apartment building. (Cf. *O'Hara* v. *Western Seven Trees Corp., supra,* 75 Cal.App.3d at pp. 802-803.) Furthermore, the function of

adequate lighting on the premises was to protect the tenants against the risk of an attack on the premises, not to protect them against an attack on a public street. Such an attack was as likely to occur whether or not the common areas of plaintiff's apartment building were secure.

As we explained above, courts have extended a landlord's liability to include injuries to the tenant resulting from criminal attacks in her apartment, even though the landlord had no control over the apartment itself. The rationale underlying liability in these cases is that the criminal intruders of necessity had to gain entrance to the apartment through the building's common entry and passageways and these portions of the premises are exclusively within the landlord's control. Therefore, the landlord's negligence in failing to adequately secure the areas under his control directly facilitated the resulting criminal act and injury. (*Ann M.* v. *Pacific Plaza Shopping Center, supra,* 6 Cal.4th at pp. 675-676; *O'Hara* v. *Western Seven Trees Corp., supra,* 75 Cal.App.3d at p. 803; *Kline* v. *1500 Massachusetts Avenue Apartment Corp., supra,* 439 F.2d at pp. 480-481.)

Were we to accept plaintiff's reasoning, there would be no way to prevent the connection between the landlord's conduct and the tenant's injury from becoming more and more tangential until it virtually disappeared. Suppose, for example, a tenant decides the building's laundry facility is unsafe due to inadequate lighting and no lock on the door. He therefore takes his clothes to a local laundromat where he is assaulted and robbed. Under plaintiff's theory of liability the landlord would be liable for the tenant's injury. Or, to take a more extreme example, suppose a tenant decides the entire building including her apartment is unsafe at night due to inadequate lighting, lack of a security patrol and similar causes. Therefore, she takes a job working nights in order to be away from her apartment in the nighttime. Leaving work one morning she is mugged in the company parking lot. Her landlord is liable for her injuries according to the plaintiff's reasoning.

Furthermore, we reject the plaintiff's theory of liability in the present case because it ignores the underlying rationale for imposing a duty on landlords to protect their tenants from criminal attack.

The duty to secure the common areas with adequate lighting, locks and other appropriate security measures is imposed to protect the tenants against "the risk of unauthorized entrance into the apartment house by intruders bent upon some crime of violence or theft." (*Kline* v. *1500 Massachusetts Avenue Apartment Corp., supra,* 439 F.2d at p. 480.) Because "only the landlord is in the position to secure common areas, he has a duty to protect against types of crimes of which he has notice *and which are likely to recur if the common*

*areas are not secure.*" (*O'Hara* v. *Western Seven Trees Corp.*, *supra*, 75 Cal.App.3d at pp. 802-803, italics added.) Patently, muggings on public streets are not the foreseeable result of the landlord's negligence in maintaining adequate lighting in the apartment building's common areas. Indeed, one would think just the opposite to be true: that crimes of violence would be more likely to occur in the dimly lit passageway of an apartment building than on a well lit public thoroughfare.

To adopt plaintiff's theory of liability would, in our view, impose an unfair burden on landlords and, in effect, force them to become the insurers of their tenants' safety, contrary to the well-established policy of this state. (Cf. *Ann M.* v. *Pacific Plaza Shopping Center*, *supra*, 6 Cal.4th at p. 679.) While recognizing the modern landlord has a duty to take reasonable precautions against foreseeable criminal acts, courts have been careful to avoid imposing standards of conduct which would effectively hold the landlord liable for all crimes committed *on* the premises. (*Landlord Liability*, *supra*, 38 Vand. L.Rev. at p. 454.) For example, recent decisions have linked the level of security the landlord must provide to the degree of foreseeability of the harm. (*Ann M.*, *supra*, 6 Cal.4th at pp. 678-679; *Pamela W.* v. *Millsom* (1994) 25 Cal.App.4th 950, 958-959 [30 Cal.Rptr.2d 690].) The goal of imposing a duty on landlords to protect their tenants should be to promote tenant safety without touching off skyrocketing inflation in the rental housing market which, ironically, would have the greatest impact on low-income tenants in high-crime neighborhoods who are most in need of protection. (Cabrera, *Negligence Liability of Landowners and Occupiers* [etc.] (1987) 23 Cal. Western L.Rev. 165, 188.) This goal is not achieved by extending the duty of landlords to protect their tenants *off* the premises, at least not under the circumstances of this case. Thus, although we sympathize with the plaintiff's plight, as did the trial court, we must conclude, as did the trial court, that liability cannot be imposed on the defendant under the circumstances of this case.

### DISPOSITION

The judgment is affirmed. Plaintiff's appeal from the order granting new trial and defendants' appeal from the judgment on the verdict are dismissed as moot. Each party to bear its own costs on appeal.

Lillie, P. J., concurred.

**JOHNSON, J.**—I respectfully dissent in what I acknowledge is a very close, difficult case.

I do not quarrel with the majority's careful exposition of the present state of the law as to a landlord's responsibility for third party crime on its

premises. Instead I am convinced the facts of this case illustrate the need for a logical, narrowly drawn extension of that duty. Otherwise the law creates a wrong set of incentives. Landlords who fall a bit short in the lighting and other security measures they provide in common areas risk liability for injuries their tenants suffer at the hands of third party criminals. But those who leave their common areas in the most dangerous possible condition, thus denying their tenants any use of those common areas and compelling them to substitute dangerous alternatives, get off scot-free.

It is possible and probably preferable to conceptualize this case as one involving an issue of causation rather than duty. There is no dispute the landlord here owed a duty to provide the class of which plaintiff was a member reasonable security measures against third party crime on the premises. There also is no dispute the landlord breached that duty. The question is whether that breach occurring on the premises "proximately caused"—or more accurately, will be recognized as a legal cause of— plaintiff's injuries which occurred off the premises.

Nonetheless, the majority follows a long tradition of California judicial opinions in analyzing the liability of landlords for third party crimes against others as a question of duty more than causation. In keeping with that tradition, I also do so, before dealing with the causation problem itself, which I see as the critical issue in this case.

I would limit the scope of the expanded duty I propose in four ways. First, it would require actual, not merely constructive, knowledge about the danger the plaintiff faced if forced to use the alternative off-premises area. Second, there would have to be a high risk of serious harm from criminal activity at the alternative location. Third, the victim would have to be a member of a class, such as a tenant, to whom the landowner owes a heightened responsibility. Fourth, it would have to be foreseeable the landlord's failure to provide proper security measures against criminal activity on its own premises would cause the plaintiff to use the alternative, dangerous site on which she suffered the injury. (With respect to the causation rather than the duty question, I would require a close and direct causal link between the landlord's negligence and the criminal acts which injured the tenant off the premises.)

The evidence in this case supports the existence of all of these conditions. There is no dispute appellant is a member of a class to whom the landlord owed a heightened duty of care. She was a tenant who was paying rent to the landlord for an apartment and a garage and use of common areas. The evidence supports a finding people parking on the street in the area of this

apartment house ran a great risk of serious harm at the hands of street criminals. Furthermore, the landlord was more than aware of the risk its tenants faced if forced to park on the streets in this neighborhood. The landlord's agents possessed actual knowledge of serious assaultive crimes against people parking their cars and walking on the streets near its apartment building. So this is not a case where the landlord could reasonably believe the alternative site its tenants might use for parking was relatively safe.

The landlord also had actual notice of several serious criminal attacks on tenants in the unlighted garages and other unlighted common areas of its own property, including an assault against this tenant's roommate in a garage. Yet the landlord did nothing. The landlord had not merely constructive notice but actual notice of the number and extent of the crimes and the lack of lighting which invited the criminals to commit those acts on these tenants. Indeed in this case the tenants informed the landlord's agents in detail about the crimes against them, and demanded adequate lighting in the common areas and other security measures. The landlord even promised to cure the problem and take those measures. Yet it still failed to do so.

This is not a case where the landlord took some security measures, but not quite enough to prevent the crime which injured the tenant. No, here the landlord did nothing, despite actual knowledge of repeated criminal activity in its unlighted garages and other common areas and its specific promise to plaintiff and other tenants it would install adequate lighting in those areas.

Accordingly, this landlord had actual knowledge it was denying its tenants secure parking, actual knowledge tenants had suffered serious criminal attacks in those garages, and actual knowledge the only alternative site, the streets, also was a dangerous place for its tenants to park. Under those circumstances, it was more than foreseeable the landlord's failure to provide secure onsite parking would cause all or some tenants to use the alternative parking site, with all its dangers, because they perceived it marginally more safe than the landlord's unlighted garages and common areas.

Under these circumstances, I consider it appropriate to extend the landlord's duty to include tenants injured by criminals off the landlord's premises because of the landlord's acts and omissions on the premises. Applying the criteria enunciated in *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], this duty is easily justified.

Once the landlord effectively denied its tenants secure parking on its premises, it was "foreseeable" one or more would suffer harm from criminal

activity. It was only a question of where—while parking in the dangerous garages or while parking on the dangerous streets nearby. Given this plaintiff's gunshot wound and other visible injuries the "certainty" she suffered harm is 100 percent. There also was a "close connection" between the landlord's failure to provide secure onsite parking in this high crime area and the injuries appellant suffered while using the only feasible alternative parking.

A high degree of "moral blame attache[s] to the defendant's conduct" in this case. Here the landlord possessed actual knowledge its building was located in a high-crime area, actual knowledge its tenants had been criminally attacked on the streets and in its unsecure garages and common areas, and actual knowledge it was not providing proper lighting and other security measures on its premises. This landlord had received specific complaints about these facts from its tenants and even promised to remedy the conditions. Yet it had failed to act. There is no dispute but that this landlord breached a duty it owed to provide reasonable security to its tenants on its premises. Indeed the breach here was so blatant and persistent as to approach if not reach the level of "reckless disregard of the safety of" this landlord's tenants. (Rest.2d Torts § 500; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 761, p. 100.) So there can be no question but that "moral blame attaches" to landlords that behave as this one did.

There also can be no serious question but that we would advance "the policy of preventing future harm" by imposing liability on landlords that breach their duty to provide reasonably secure premises in high crime areas and thus cause tenants to resort to the equally or nearly equally dangerous alternative of street parking. Indeed to allow them to escape liability in these circumstances encourages rather than discourages future harm. The majority permits such landlords to avoid the risk of a tort judgment by making their own parking facilities so insecure they are unusable and thus relegating their tenants to the tender mercies and gentle justice of the streets. Conversely, if we impose liability in these circumstances we increase the landlord's incentive to provide adequate security arrangements and thereby discourage criminal assaults on future tenants.

Expanding the landlord's duty along the lines suggested would not impose an additional "burden" on landlords beyond those they already bear. That is because they already owe the duty and "bear the burden" of providing adequate security measures on their own premises. The duty I propose does not require them to supply any greater security on their own premises or to extend their security measures to the streets. By satisfying the duty they already owe on their own premises, they meet the duty to avoid causing their

tenants to substitute street parking for onsite parking. If a tenant elects to use the streets despite the availability of secure onsite parking, the landlord would not be liable. So the burden of this expanded duty is the same as the burden of the duty already owed.

The "consequences to the community" of this expanded duty appear entirely positive. Landlords would have an added incentive to fulfill their existing duty to supply tenants with reasonably secure onsite parking, thus reducing the level of criminal attacks and injuries to tenants. The impact on rents and insurance rates should be minimal. After all, we would only be increasing the consequences for conduct that constitutes a breach of a duty landlords already owe tenants, and then only when the breach is so blatant it is foreseeable those tenants will reasonably feel the streets are safer than the landlord's common areas. This is a risk landlords should have no trouble ensuring under policies presently available. On the other hand, it would be more difficult for tenant drivers to ensure against the risk they will be criminally assaulted in or near automobiles they park on the streets—and especially the special case where they are compelled to park there because their landlord failed to supply reasonably secure parking on the premises.

Conceptualizing this as an issue of causation rather than duty, I still need not consider the remote hypotheticals the majority conjures. In the instant case, the victim did not suffer her injuries while leaving a night job she took to avoid using the landlord's parking garage at night or while in a bus she was using as an alternative to parking there. Rather she was robbed and nearly killed while doing the very thing, parking her car, which the unlit parking lot prevented her from doing in safety. It is as if, after appellant paid rent for secure parking on the premises, the landlord stood in the driveway and told her, "you can't park here, go park on the street." Geographically, appellant suffered her injuries while parked on the street directly across from defendant's property. If the landlord's gross negligence denied its tenants a safe place to garage their cars, it was not merely "foreseeable" appellant would elect to park where she did, it was *the most reasonable and predictable reaction* to the predicament the landlord created. In essence, defendant's deliberate refusal to provide its tenants with safe on-premises parking left appellant with no choice but to park in a location only somewhat safer than defendant's unlit garage.

The majority argues the landlord's failure to provide the promised safe onsite parking did not *facilitate* the assault on appellant as it could be said it did if appellant parked in the unlit garage and the attackers used the darkness to their advantage. Even if "facilitation" were a requirement of causation, however, and I am not persuaded it is, in a real sense denying this young

female victim access to safe onsite parking "facilitated" these street marauders in their assault on her. If defendant landlord had lived up to its duty and its specific promise to its tenants, appellant would not have been where the marauders could get to her. Their deadly mission was "facilitated" directly because the landlord's behavior forced this vulnerable victim into their arena, the streets.

For these reasons, I consider it is feasible and proper to expand slightly the liability landlords face when they breach their duty to take reasonable security measures against reasonably foreseeable criminal activity. It matters little whether this is viewed as an expansion of the duty landlords owe their tenants to include tenants injured in this manner offsite or as recognition of the causal connection between a breach of the existing duty owed tenants onsite and the consequent harm offsite. In either event, the landlord who behaves as this one did has brought it upon itself. Either deliberately or with utter indifference to the safety of its tenants this landlord refused to take *any* measures calculated to discourage criminal attacks in its garages or common areas despite several prior assaults in and near those areas. Not only did this blatant breach reasonably cause this tenant to seek parking in the only alternative location available, the streets of this high-crime area, but it was reasonably foreseeable she and other tenants would do so. Logic and sound policy both dictate landlords should be held liable when their clearly blameworthy conduct has these predictable and serious consequences.

A petition for a rehearing was denied April 9, 1996. Johnson, J., was of the opinion that the petition should be granted. The petition of appellant Debra S. Rosenbaum for review by the Supreme Court was denied June 26, 1996. Mosk, J., Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.